IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 2, 2018

IN RE KENDALL M.[1]

**Appeal from the Juvenile Court for Hamilton County**
**No. 276548   Robert D. Philyaw, Judge**

_____

**No. E2017-01769-COA-R3-PT**

_____

Kendall M. was born in January 2016; she tested positive for amphetamines at birth and was placed in the Neonatal Intensive Care Unit where she was diagnosed with Neonatal Abstinence Syndrome and suffered from withdrawal symptoms. Upon her release from the hospital, she was placed with foster parents, in whose care she has remained. A proceeding to have her declared dependent and neglected was initiated by the Department of Children's Services and permanency plans developed in May and October of 2016. In March of 2017 the Department filed a petition to terminate the parental rights of Kendall's Mother on the grounds of abandonment by an incarcerated parent and substantial noncompliance with the permanency plans; following a hearing, the court granted the petition and terminated Mother's rights on both grounds. Mother appeals the termination of her rights on the ground of substantial noncompliance with the permanency plans and the holding that termination of her rights was in the best interest of Kendall. Upon our review, we conclude that there is clear and convincing evidence to support the termination of her rights on both grounds, and the finding that termination of Mother's rights is in Kendall's best interest; accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Greta Locklear, Chattanooga, Tennessee, for the appellant, Brittany M.

Herbert H. Slatery, III, Attorney General and Reporter; Michael C. Polovich, Assistant Attorney General; for the appellee, Tennessee Department of Children's Services.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties

Todd A. Davis, Chattanooga, Tennessee, Guardian ad litem.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

This appeal arises from a proceeding to terminate the parental rights of Brittany M. ("Mother"), mother of Kendall M., who was born in January 2016; the parental rights of Darrell P., the legal father of Kendall, and Matthew P., Kendall's putative father, were not included in the proceeding and are not at issue in this appeal.

At the time Mother was admitted to the hospital to give birth, she tested positive for amphetamines and tetrahydrocannabinol ("THC"). Kendall tested positive for amphetamines at birth and was placed in the Neonatal Intensive Care Unit ("NICU") where she suffered from withdrawal symptoms and was diagnosed with Neonatal Abstinence Syndrome. While Kendall was in the hospital, Stephanie D. and Bryan D., friends of Kendall's maternal great-grandfather, ("Ms. and Mr. D.") filed a petition for temporary custody of her; the petition was granted and she was released from the hospital into their custody on January 24, 2016, where she has remained.[2]

On April 21, 2016, the Department of Children's Services ("DCS") filed a Petition for Temporary Legal Custody and *Ex Parte* Order, requesting that the court find Kendall dependent and neglected and severely abused, and that the court enter an immediate protective custody order, placing her in temporary legal custody of DCS; the requested order was entered on April 23. DCS developed a permanency plan for Kendall on May 5, 2016, with a goal of return to parent.[3] Mother signed the plan and the Criteria and Procedures for Termination of Parental Rights on July 18, and the plan was ratified in an Adjudicatory Hearing Order entered November 17, in which the court declared Kendall to be dependent and neglected. A second permanency plan was developed on October 27, 2016, with a goal of return to parent/adoption, and ratified by order entered March 16, 2017; Mother refused to sign the October plan and accompanying Criteria and Procedures for Termination.

A hearing on the dependency and neglect petition was held on November 1, 2016; the Adjudicatory Hearing Order entered on November 17 recites that Mother had notice of the hearing, failed to appear in person but was represented by counsel, and that counsel

---

[2] The portion of the Juvenile Court record pertaining to the petition for temporary custody filed on January 19, 2016, by Ms. and Mr. D. is not a part of the record on appeal.

[3] The May permanency plan, as well as one developed in October, 2016, also addressed Mother's two other children, Kelsey, born in November of 2008, and Makayla, born in July 2013. The record does not show the dates or conditions upon which those children came into DCS custody and Mother's rights to those children are not at issue in this case.

waived Mother's right to an adjudicatory hearing and stipulated that the following facts were true:

> [Kendall] is dependent and neglected within the meaning of T.C.A. § 37-1-102(b)(12) because the subject child's urine tested positive at birth for amphetamines, and the child experienced withdrawal symptoms as a result of the drug exposure. In addition, the subject child continues to have medical needs as a result of the drug exposure.
>
> Specifically, the subject child was born prematurely at 35 weeks gestation and weighed four (4) pounds at birth. As a result, the child was placed in the Neonatal Intensive Care Unit (NICU) at Erlanger Children's Hospital. Medical personnel at Erlanger reported that the subject child demonstrated signs of withdrawal. Specifically, the child appeared to be "jittery."
>
> When the mother was admitted to the hospital, medical personnel reported that she was "acutely intoxicated." The subject child's mother tested positive for amphetamines and THC at the hospital. As a result of this investigation, CPS substantiated the mother for "drug exposed child."
>
> The mother had reported to Erlanger medical staff that she was on Subutex and was in treatment at the Volunteer Treatment Center in Chattanooga. The mother also informed medical staff that she had recently separated from her husband, Darrell [P.]. According to medical staff, the mother admitted that she had recently relapsed back to using drugs due to the stress of the separation.
>
> The mother had reported that the subject child's biological father may be the legal father, Darrell [P.]. However, she also reported that Matthew [P.] may be the child's biological father. The mother had stated that DNA testing would be needed to identify the biological father of the subject child. Both [Darrell P.] and [Matthew P.] were present at the hospital following the subject child's birth. However, only [Darrell P.] was allowed to visit with the child since he is the legal father.
>
> The mother has two older children, Makayla [P.] and Kelsey [B.], who were already in DCS custody and placed in the home of a relative, Ava [C.] [hereinafter "Ms. C."]. The mother was substantiated by CPS for "abandonment" and "drug exposed child" as a result of investigations regarding these children. At the time of Kendall's removal, the mother still needed to demonstrate stability and complete her tasks on the permanency plan that was developed regarding her other children already in DCS custody. Specifically, the mother needs to fully complete alcohol and drug treatment, mental health counseling and/or treatment, and submit to random drug screens to prove sobriety.
>
> On January 14, 2016, CPS Investigator Sharon Hines met with the mother and the child's maternal grandmother, Tina [M.] [hereinafter Ms.

M."], at the DCS office. The mother was living with Ms. M. at that time. When CPS asked the mother about alternative placement options for the subject child, the mother suggested the child's maternal great grandmother. However, CPS informed the mother that this placement would not be appropriate due to the presence of cigarette smoke in the home and because the child has ongoing medical problems, including lung development complications. The mother also suggested that [Darrell P.] and [Matthew P.] undergo DNA testing to determine which one is the biological father of the child.

***

[Ms. C] is caring for the mother's other two children who are in DCS custody, and she was unable to additionally care for the subject child. The subject child's maternal great grandfather is Wayne [M.] [hereinafter "Mr. M."]. [Mr. M] previously served as a temporary alternative relative placement for the mother's two older children. [Mr. M.] said he was unable to serve as a long term placement option for the subject child. However, [Mr. M.'s] girlfriend, Denise, has a daughter, [Ms. D.], who is a nurse and was willing to care for the subject child.

On January 19, 2016, [Mr. and Mrs. D.] filed a petition for temporary custody of the subject child and were granted custody by this Honorable Court. The Department conducted background checks on the petitioners. In addition, a home study was conducted and their home was deemed appropriate for the subject child. The subject child has been with [Mr. and Mrs. D.] since her discharge from the hospital on January 24, 2016.

The mother continued to have untreated alcohol and drug issues and mental health issues. Therefore, the Department filed its Petition for Temporary Custody of the subject child on April 21, 2016, so that the Department could provide assistance and resources to the parents, such as supervised visitation to be provided by DCS and facilitation of DNA testing. [Mr. and Mrs. D.] were willing to attend PATH classes to become foster parents so that the child could continue to remain in their home.

On the basis of the foregoing, the court adjudicated Kendall to be dependent and neglected; the court ordered that Kendall be removed from Mother's home pursuant to Tennessee Code Annotated section 37-1-114(2) and that she remain in foster care, with DCS having authority to consent to medical and other necessary care and to allow supervised visitation by Mother. A permanency hearing was set for March 28, 2017.

The permanency hearing was held as scheduled, and on April 28, the court entered an order stating the following with respect to the parties' compliance with and progress under the then-current permanency plan:

4

8. Compliance with the current permanency plan (aka case plan) is as follows:

a. DCS is in substantial compliance;

b. the mother, [Brittany M.], is not in substantial compliance in that she has not completed alcohol and drug treatment, she has not been receiving mental health treatment, she has not established suitable housing, she has incurred additional criminal charges, and she has missed scheduled visits with the child. Ms. Ash testified that visits are every Monday at the DCS office, and the mother has missed about two visits every month. In addition, the mother pleaded guilty to a charge of "Domestic Assault" in December 2016, in which her grandmother was the alleged victim. Ms. Ash testified that the mother has not yet provided documentation requested by the Department, such has proof of a lease, her probation officer's name, and proof that she recently went to CADAS and Joe Johnson for assessments. In addition, during the pendency of this case, the mother has been asked to leave the CADAS program twice. She has refused to submit to drug screens by the Department in the past. On March 21, 2017, the mother was drug screened at a visit and tested positive for morphine, amphetamines, and hydromorphone. The mother has provided a photograph of some medication bottles prescribed to her, which include the medications: aripiprazole and lamotrigine. The mother has also provided documentation of a few pay stubs from a job she has recently obtained.

***

9. Progress toward resolving the reasons the child is in foster care has been made but the following barriers still exist:

The parents have not completed the tasks on their family permanency plans. The Court noted that the parents have had ample time to complete the tasks on their permanency plans since they have older children who were also in DCS custody previously before exiting custody with a relative. The Court is of the opinion that if the parents don't take care of their drug dependency issues through treatment, even if the mother can maintain some sobriety through her probation, the underlying issues won't get resolved until both parents have completed alcohol and drug treatment.

The court ordered that Kendall remain in foster care. The order also noted that DCS had filed a petition to terminate Mother's parental rights on March 20, and that a first hearing on that petition was set for May 3.

Termination of Mother's rights was sought on the grounds of abandonment by incarcerated parent and substantial noncompliance with permanency plans. The final hearing on the petition took place on June 22, and an order terminating Mother's rights on the grounds asserted was entered on August 3.[4] Mother appeals, stating the following issues:

> I. Whether the trial court's finding of substantial non-compliance is supported by clear and convincing evidence.
> II. Whether the trial court's finding that termination of Mother's parental rights is in the best interests of the child is supported by clear and convincing evidence.

While Mother has only challenged the holding with respect to the ground of noncompliance with the permanency plan, in accordance with the instruction of *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016), we will review the evidence pertinent to each ground for termination.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App.

---

[4] For some reason not apparent from the record, an Amended Order, identical to the original order, was entered August 8.

2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

### III. SUBSTANTIAL NONCOMPLIANCE WITH THE PERMANENCY PLAN

Tennessee Code Annotated section 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan where"[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4[.]"

In conjunction with terminating a parent's rights on this ground, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine,* 79 S.W.3d 539, 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). Further, in order for noncompliance to justify the termination of parental rights, it must be "substantial." Tenn. Code Ann. § 36-1-113(g)(2); *In re S.H.,* No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008) (no perm. app. filed). Mere technical noncompliance by itself is not sufficient to justify the termination of parental rights. *In re S.H.,* 2008 WL 1901118, at *7. Therefore, the parent's degree of noncompliance with a reasonable and related requirement must be assessed. *Id.* Inasmuch as the issue of substantial noncompliance with the requirements of a permanency plan is a question of law, our review is *de novo* with no presumption of correctness. *In re Valentine,* 79 S.W.3d at 546.

The trial court made extensive findings of fact relative to this ground:

24) After the child entered custody, the Department created permanency plans for the child. The permanency plans listed a number of requirements that the Respondent needed to satisfy before the child could safely be returned home, as follows:
a) Provide and maintain a safe living environment; notify DCS when she has secured housing of her own so DCS can complete a home study; b) maintain housing of her own for no less than three (3) consecutive months; provide DCS proof that the lease and all

7

utilities are in her name; c) ensure the home is clean and free from environmental hazards; d) provide a safe environment free from domestic violence, drugs and illegal activities; e) resolve all pending legal issues; f) follow the rules and regulations of probation, if ordered; g) refrain from any illegal activities or engaging with individuals who are known to participate in illegal activities or being in environments where illegal activities are taking place; h) cooperate with the requirements of parents of children in state custody and be financially responsible for the children; maintain contact with the Department; i) attend CFTMs, Foster Care Review Board meetings and court hearings; j) provide DCS proof of legal, verifiable means of income of their own; k) document all efforts to support the children such as clothing, diapers, wipes, daycare expenses, etc.; 1) encourage the children through visits, phone calls and letters; sign all necessary releases of information and notify DCS of any change in circumstances such as address, phone number, and health status; m) participate in a clinical assessment to address her self-reported diagnoses of bipolar disorder, manic depression, and multiple personality disorder; n) follow all recommendations made by the treatment professional, including but not limited to additional individual counseling, group counseling, support groups, etc; o) sign any necessary releases for DCS to communicate with treatment professionals; p) ensure that treatment professionals for the children are informed of any medical or dental problems, so that appropriate treatment can be secured; q) refrain from using and/or being impaired by alcohol, illegal drugs and/or prescribed drugs to the extent that it impairs her ability to parent effectively or places the children's safety at risk; r) if she fails her drug screen, participate in an alcohol and drug assessment to address her drug use and the negative impact it has on her ability to parent effectively; s) follow any and all recommendations, including but not limited to in-patient treatment, outpatient treatment and/or AA/NA meetings; t) refrain from using any illegal substances or abusing legal substances such as alcohol and prescription medications; u) participate in random and periodic drug screens as requested by DCS to verify her sobriety; v) resolve all pending legal issues.

25) On November 1, 2016, the Hamilton County Juvenile Court ratified the permanency plan dated May 5, 2016 as in the child's best interests and found that the requirements for the Respondent were reasonably related to the reasons for foster care. The Respondent, [Mother], signed the

permanency plan and the Criteria for Termination of Parental Rights on July 18, 2016.

26) On January 25, 2017, the Hamilton County Juvenile Court ratified the second permanency plan dated October 27, 2016, finding the plan to be in the child's best interests and found that the requirements for the Respondent were reasonably related to the reasons for foster care. The Respondent, [Mother], refused to sign the plan. However, she was provided a copy.

27) This Court also finds that each plan was in the best interest of the child and that the responsibilities for [Mother] were reasonably related to the reasons that necessitated foster care.[5]

28) The Court finds that the Respondent, [Mother], has failed to substantially comply with the responsibilities and requirements set out for her in the permanency plans prepared for her. [Mother] remains without safe and stable housing for the child. She has never provided the Department with a lease or other documentation of stable housing. During this custodial episode, [Mother] has mostly lived from hotel to hotel with different friends. Currently, she resides with her mother at the Mountain Shade Trailer Park in Soddy Daisy, Tennessee, where she has been banned from entering by the Soddy Daisy City Court in connection with her domestic assault conviction. [Mother] continues to engage in illegal activities and continues to incur criminal charges, as stated above. While [Mother] testified that she obtained a mental health assessment, she has not provided the Department proof of her assessment and did not sign a release to allow the Department to access such information. However, the Court is willing to give [Mother] the benefit of the doubt with respect to that particular responsibility. She has not provided the Department with proof of compliance with counseling or medication management. She has failed to complete drug treatment despite the recommendations. She failed to comply with the recommendations of Council for Alcohol & Drug Abuse Services (CADAS) that she complete a residential treatment program and was discharged for non-compliance with the program. [Mother] has continued to fail drug screens for the Department. Specifically, she failed a drug screen on July 18, 2016 for amphetamine and methamphetamine and failed yet another screen on October 27, 2016 for amphetamine. On March 20, 2017, [Mother] failed yet another screen for morphine and amphetamine. Further, [Mother] has failed to always submit to random screens as requested, refusing screens on June 13, 2016 and December 16, 2016. She has not stayed in consistent contact with the Department and has failed to maintain consistent visitation with the child, as she failed to attend about twenty (20) visits.

_____

[5] The plans were initially ratified by the Juvenile Court Magistrate.

29) The Court finds that the Department has made reasonable efforts to assist the Respondent with the accomplishment of her responsibilities under the plan and notes also that the Department has worked with [Mother] since September 2015 with regard to her older children, Makayla [P.] and Kelsey [M.] under prior permanency plans. At trial, [Mother] admitted that she has no excuse for not working her permanency plans.

On appeal, Mother does not contend that the requirements of the plan were not directed toward addressing the circumstances which necessitated DCS involvement or that the findings are not supported by clear and convincing evidence. She also does not cite to evidence which preponderates against the findings. Mother argues that Tennessee Code Annotated sections 36-1-113(g)(2) and 37-2-403(a)(2)(A) require that the plans provide a separate statement of responsibilities for the parent, whereas in this case "both [p]lans exceed thirty pages and the sections entitled 'STATEMENT OF RESPONSIBILITIES' are fifteen pages in length," and did not clearly set forth Mother's responsibilities.

We have reviewed the record at length and determined that the evidence clearly and convincingly supports the trial court's findings. The testimony of Kimberly Ash, DCS Case Manager, and Ms. Katherine Wolfe-Blackwell, a DCS employee who supervised Mother's visitation with Kendall, as well as Mother, provide clear and convincing evidence in support of the court's findings as to the nature and extent of Mother's non-compliance with the requirements of the permanency plans, quoted above.

Ms. Ash testified that she received responsibility for the case on May 20, 2016, and that her first contact with Mother and Kendall's father was at a visitation on July 18, at which time the parents signed the plan; in her testimony she first summarized Mother's responsibilities under the plan as follows:

Q. Okay. What was the -- what were the mother's responsibilities on the permanency plan dated May 5th of 2016?
A. Participate in a mental health assessment to address parenting skills, ability to parent long-term, and any other mental health items identified during the therapeutic sessions, all recommendations will be followed; participate in an alcohol and drug assessment to address drug use and the negative impact it has on her ability to parent affectively, follow all recommendations; submit to random drug screens; refrain from any illegal activities or engaging with individuals who are known to participate in illegal activities, or being in an environment where illegal activities take place; provide a copy of a lease to verify housing; provide proof of legal, verifiable means of income of their own; sign all necessary releases; stay in contact with the Department regarding change of circumstances; pay child

support if ordered; continue to attend Child and Family Team Meetings and court hearings; and adhere to the visitation schedule.

Ms. Ash then proceeded to discuss in detail the resources and other assistance Mother was provided to comply with the plan, specifically in the areas of obtaining a mental health assessment and treatment, stable housing, and employment, as well as Mother's history of positive results of drug screens; she stated that Mother's lack of compliance continued after the October 2016 plan was developed, save for the fact that Mother was working. Ms. Ash summarized Mother's lack of compliance:

> Q. Since you've been involved in this case, has the mother made any progress -- has she made any progress to where you would be comfortable placing Kendall [M.] back into her home?
> A. No, ma'am.
> Q. And what are the reasons why you would have concerns about doing that?
> A. Well, she was just recently released from jail, and she's had about four incarcerations, I believe it is, since I took the case -- or since the case came into custody.
> Her drug use as of -- as late as March 20th, she was positive. She has been inconsistent with her treatment. She went to Serenity House, left against medical advice. She left Cadas after being dishonest about having someone else in the program.
> She also started another one and left the very next day because she didn't want to comply with -- yeah. That was Cadas. She was admitted on 9/22/16; discharged on the 23rd, 9/23, due to refusing to comply.
> Her mental health issues I really feel have been a big factor in this. She's been very angry with me at times, just blaming everybody else for her situation but herself.
> I arranged visits for her with Kendall. She missed numerous visits. It's just been inconsistent, no-shows, wouldn't even call to say she wasn't coming to most of them. Her relationship – she's been back and forth with [Darrell P.] the entirety pretty much of this case, [Darrell P.] or [Matthew P]. She's just really not been stable in any respect.
> I mean, when she gets out of jail she does good for a minute it seems, but then something else happens.

Without a specific citation to the record, Mother argues that the trial court "found Mother to be credible; therefore, all of Mother's testimony should be taken as true." We have reviewed the record at length and cannot discern where the court may have made such a credibility finding or, if it did, the context in which it was made. In its oral ruling following the presentation of proof, the trial court began its ruling as follows:

11

We have [Mother], who appears to be in a much better place today than what the evidence shows she's been in for the last 18 months or so.

* * *

But she is apparently working to combat her drug addiction and to get herself stable by at least working for a few months and holding a job. And that's a huge improvement, and I certainly hope for your sake and for everyone, that you continue down that path and do those things.

* * *

. . . I want to say that I don't believe that this is a case where the Department decided this mother's an addict and not worth working with at all.

And, in fact, I think the Department could have done that, could have filed, almost immediately, termination based on severe abuse for the drug-exposed baby that this was, and they didn't do that, and instead chose to try and work with this mother. So you know - - that's evident throughout the testimony.

After recapping the testimony, including that of Mother, the court noted the following:

As to Ground 2, substantial noncompliance with the permanency plan, "substantial noncompliance" are the keywords. There is some testimony that says the Mother didn't complete anything on the plan.

I think Mother did make some progress or made some progress too late, but certainly not enough to be in substantial compliance with the plan, and for all the reasons I already set out.

And so rather than beat these facts over, and in applying what I've already said and ruled on, the Court finds that there is clear and convincing evidence that [Mother] is not in substantial compliance with the permanency plan, and that the Department worked with her in those things. She knew the plan, she had the plan, she knew the steps she needed to take and failed to do that.

These statements (as well as the court's discussion of the evidence court prior to the quoted summary) demonstrate that the court considered Mother's testimony along with the testimony of the other witnesses, and gave her testimony the weight the court deemed appropriate. We have reviewed the entirety of Mother's testimony and it does not preponderate against the findings of the court.

While Mother does not assign error or request relief in this regard, she also asserts in the Factual History section of her brief on appeal that the court did not review the May 2016 plan within sixty days of the foster care placement. We have reviewed the record and do not discern any reversible error on the part of DCS or the court in approving the plan. When the May 2016 plan was prepared Mother's two other children were already

in DCS custody and under a permanency plan as a result of proceedings initiated prior to Kendall's birth.  The May 2016 permanency plans added provisions specific to Kendall to the plan previously created for the other children.  We have not been cited to any testimony by Mother that she did not understand what was required of her relative to Kendall; to the contrary, she testified that she did understand that she was required to get drug treatment, to have a mental health evaluation, pay child support, and visit Kendall regularly.  Mother signed the May 2016 plan on July 18, affirmatively acknowledging in the space provided that the plan had been discussed with her, that she agreed with it, that she had been given a copy of the plan, and would have the opportunity to express disagreement when it was presented to the court for ratification.  The October plan continued the responsibilities in the May plan.

The May 2016 plan was ratified in the Adjudicatory Hearing Order entered in Kendall's case on November 3, 2016.[6]  That order also states that, through her counsel, Mother stipulated that she "was substantiated by [Child Protective Services] for 'abandonment' and 'drug exposed child' as a result of investigations regarding [Kelsey and Makayla]" and that "[M]other still needed to demonstrate stability and complete her tasks on the permanency plan that was developed regarding [Kelsey and Makayla] already in DCS custody."  There is no indication in the technical record or at the termination hearing that Mother raised any objection or concern that the May 2016 plan was not reviewed by the court within 60 days of its creation and, given the fact that this proceeding is closely related to two others, we do not assume that the plan was not reviewed in that time period or that any failure in that regard was not waived.  Pursuant to Tennessee Rule of Appellate Procedure 24(g), it is Mother's responsibility to include in the record the documents "as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the basis of appeal."  There is no evidence in the record from which to conclude that Mother was not aware of her responsibilities or was unable to express any concern as to her responsibilities under either permanency plan.[7]

## IV.  ABANDONMENT BY INCARCERATED PARENT/WANTON DISREGARD

Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv) provide that parental rights may be terminated on the ground of abandonment where "[a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child" and "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child."  Our courts

---

[6] The order was apparently signed by the Magistrate on November 17, 2016.

[7] In this regard, we also note that Kimberly Ash, the DCS case manager, testified that the first plan, involving Kelsey and Makayla, was developed on November 10, 2015; that, to her recollection, Mother was incarcerated at the time the May 2016 plan was created and was signed on July 18 when she first met with Mother and Kendall's father.  At that time the parents also signed the Criteria for Termination.

have held that a finding of wanton disregard need not be based on conduct occurring during any particular time period. *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005). It "reflects the common-sense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child . . . . A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* at 866. Incarceration alone, however, is not a ground for termination of parental rights:

> [T]he parent's incarceration serves as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a substantial risk to the welfare of the child.

*Id.*

With regard to this ground, the court made the following findings:

14) Respondent, [Mother] was incarcerated during all or part of the four (4) months immediately preceding the filing of this petition, as [Mother] was incarcerated on two (2) different occasions during the four (4) months preceding the filing of the petition: February 18, 2017 to February 21, 2017 and prior to that on November 20, 2016 to December 14, 2016.

15) [Mother] entered treatment at Serenity Center while pregnant with the subject child to address her drug issues. [Mother] was discharged from the facility on October 30, 2015 as a result of her leaving Against Medical Advice (AMA). [Mother] testified that she left the facility on October 23, 2015 after midnight without discussing it with counselors or staff members. [Mother] failed to follow advice from staff and comply/complete treatment. Her discharge plan recommended that she complete daily NA/AA/CR attendance and for her to obtain and utilize an NA/AA sponsor, which she failed to do.

16) Following the birth of the subject child, [Mother] was arrested on January 23, 2016 for Failure to Appear and remained incarcerated until January 30, 2016, after previously having a court date for Driving on Suspended License, and not attending the court hearing.

17) On March 9, 2016, [Mother] was drug screened by the Department and tested positive for amphetamine and methamphetamine.

18) On June 13, 2016, the Department attempted to conduct a drug screen on [Mother]; however, she refused to submit to the drug test. On July 18, 2016, [Mother] submitted to a drug screen, which was positive for amphetamine and methamphetamine. On October 27, 2016, [Mother] submitted to a drug screen, which was positive for amphetamine. On March

14

20, 2017, [Mother] submitted to a drug screen, which was positive for morphine and amphetamine.

19) On November 20, 2016, [Mother] was arrested by the Soddy Daisy Police Department and incarcerated for two counts of Aggravated Domestic Assault against her mother and her grandmother. She was incarcerated from November 20, 2016 to December 14, 2016. On December 13, 2016, [Mother] entered a plea to a lesser count of Domestic Assault. [Mother] was ordered to serve a suspended sentence of eleven (11) months, 29 days probation; to obtain a mental health assessment and follow the recommendations; and, to stay out of the Mountain Shade Trailer Park, where [Mother's] mother resides.

20) On February 18, 2017, [Mother] incurred an additional charge of "Misuse of 911 System" by the Soddy Daisy Police Department. She was incarcerated from February 18, 2017 to February 21, 2017 due to this offense. [Mother] admitted that she was under the influence of alcohol when she called 911 and posted a video of the 911 call on Facebook; however, she testified that she immediately deleted it. The charge remains pending at this time.

21) [Mother] had a hearing scheduled on April 11, 2017 in Soddy Daisy, Tennessee to review her compliance with her probation; however, [Mother] was arrested for Failure to Pay Child Support for her two older children and remained incarcerated until June 8, 2017.

22) The Court finds that [Mother] has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. Specifically, [Mother] left drug treatment while pregnant with the child and continued to use illegal substances while pregnant causing the child to be exposed to illegal drug use while in utero and which resulted in the child testing positive at birth for amphetamines. At trial, [Mother] admitted to using heroin during her pregnancy with the subject child. She testified that she believed the child tested positive for Subutex at birth, as she was going to a methadone clinic to help her "come off" heroin. After the child's birth, [Mother] continued to use illegal substances and incurred multiple criminal charges, causing her to be arrested and jailed on multiple occasions. Her repeated criminal activities displayed indifference and a wanton disregard for her own welfare, let alone the welfare of her own child, in addition to her lack of interest in maintaining contact with the child through regular visitation.

As noted earlier, Mother does not appeal this ground of termination of her rights. Upon our review of the record, the findings are supported by clear and convincing evidence, including Mother's testimony as to the dates of her incarceration, her use of herein during her pregnancy, the fact that both she and Kendall tested positive for drugs at Kendall's birth, her failure to complete drug and mental health treatment programs,

15

and her failure to maintain stable housing. Records of her criminal convictions were introduced at trial, as well. We affirm the court's conclusion that clear and convincing evidence existed to support this ground for termination.

## V. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[8] The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at \*3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-

---

[8] The factors at Tennessee Code Annotated section 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

16

PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).  As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests.  The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

In the order terminating Mother's rights, the court made specific findings as to the factors at Tennessee Code Annotated section 36-1-113(i).  Many of the findings were predicated upon matters which related to the grounds for termination, discussed previously in this opinion, bearing on Mother's exposure of Kendall to drugs *in utero* (statutory factor (6)) and the fact that Mother continued to incur criminal charges and use drugs and failed to achieve sobriety or complete an alcohol and drug program to assist her (factor (7)).  In addition, the court noted testimony that there was no bond or meaningful relationship between Mother and Kendall and that Mother had not maintained "regular, consistent visitation" with Kendall (factors (3) and (4)).  Of particular importance to this issue is the finding relative to factor (5):

> The Court finds, pursuant to T. C. A. § 36-1-113(i), that it is in the best interest of the child for termination to be granted as to [Mother], because changing caretakers at this stage of the child's life will have a detrimental effect on her.  The child is in an [pre-] adoptive home and is thriving there.  The subject child was discharged from the hospital on January 24, 2016 and was released to [Mr. and Ms. D].  She has remained in the home since that time and is the only family that the child knows.  Despite the child's ongoing medical issues, the child appears to be doing very well in the D[.] home.[9]

The evidence clearly and convincingly establishes that termination of Mother's rights is in Kendall's best interest.

---

[9] Of particular significance in this regard is Ms. D's testimony that, because of the circumstances of her birth, Kendall has had medical and delayed developmental issues, with uncertain long term effects, which require a special level of care.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the trial court terminating Mother's parental rights is affirmed.

_____
RICHARD H. DINKINS, JUDGE